BROWN SPECIALTY COMPANY, Plaintiff-Appellee, *v.* ROBERT H. ALLPHIN, Director, Department of Revenue, Defendant-Appellant.

Third District   No. 78-236

Opinion filed August 24, 1979.

William J. Scott, Attorney General, of Chicago (Robert G. Epsteen, Assistant Attorney General, of counsel), for appellant.

Barash & Stoerzback, of Galesburg, and Routman, Lawley & O'Hara, Ltd., of Springfield, for appellee.

Mr. JUSTICE ALLOY delivered the opinion of the court:

The Department of Revenue (hereinafter called "Department") appeals from the decision of the circuit court in a review proceeding under the Administrative Review Act. (Ill. Rev. Stat. 1977, ch. 110, pars. 275, 276.) The Department had assessed tax deficiencies totaling $275,748.29 against Brown Specialty Company. The amounts assessed included tax deficiencies, fraud penalties and interest against Brown Specialty for the alleged filing of fraudulent retailers' occupation tax returns covering the period from December 1, 1962, to June 30, 1969. Hearings before an examiner of the Department were held, and the assessments were upheld by him. Brown Specialty then appealed to the circuit court sitting in review of the administrative action, under provisions of the Administrative Review Act. Ill. Rev. Stat. 1975, ch. 110, pars. 267-275.

The circuit court reversed the findings of the hearing examiner. It found that the department had failed to prove fraud for the period at issue (December 1, 1962, to June 30, 1969) and that deficiency assessments were barred by the three-year statute of limitations for nonfraudulent returns. (Ill. Rev. Stat. 1973, ch. 120, par. 443.) From this decision, reversing the administrative findings and the assessment, the Department appeals. On appeal, the Department raises two issues: (1) whether the Department's determination that Brown Specialty had filed fraudulent returns for the period December 1, 1962, through June 30, 1969, was against the manifest weight of the evidence, and (2) whether the Depart-

ment's determination of the amount of deficiency owed to them was against the manifest weight of the evidence.

The record discloses that Brown Specialty Company is a corporation with its principal place of business in Galesburg, Illinois. Brown Specialty is in the business of selling candy, cigarettes, tobacco, gloves, pens and food products to a wide variety of commercial customers. In 1972, the Department of Revenue, acting upon information supplied by three former employees of Brown Specialty, conducted an audit of the books and records of the company. During the course of that audit Department representatives examined sales invoices and records for the period July 1, 1969, through October 1972. As a result of that audit and information supplied by the former employees, the Department concluded that Brown Specialty had understated its sales tax liability. It assessed an additional tax against Brown for the period 1969-1972, including fraud penalties and interest. The Department, as a result of its investigation, also assessed tax deficiencies for the periods December 1, 1962, through June 30, 1965, and July 1, 1965, through June 30, 1969, including therein assessments for fraud and interest.

In computing the tax deficiencies for the periods between 1962 and 1969, the Department used the percentage of error in reporting that the Department contended had been established for the 1969-1972 period. It applied that percentage figure to the available gross figures for the period 1962-1969. This method was utilized because no records were available covering the 1962-1969 period at the time of the 1972 audit. Brown Specialty, as a result of the Department's 1972 investigation, was served, in early 1973, with three separate notices of tax liability. The first, for the period December 1, 1962, through June 30, 1965, showed a liability of $78,871.79. The second, for the period July 1, 1965, through June 30, 1969, showed a liability of $196,876.50. The third notice, for the period July 1, 1969, through October 31, 1972, showed a liability of $129,129.78. All such assessments included amounts for interest and fraud penalties. Brown Specialty filed a timely protest of these assessments and requested hearings on them.

The only hearings and assessments with which this appeal is concerned are those dealing with the periods 1962-1965 and 1965-1969 (hereinafter referred to as "1962-1969"). At the hearings covering those periods, the Department relied principally upon the testimony of three former employees of Brown Specialty Company in seeking to establish fraud for the periods in question. Josephine Thomas testified that she had been the general bookkeeper for Brown Specialty from 1956 through September 1972. As general bookkeeper she prepared the monthly retailers' occupation tax returns (hereinafter called "sales tax returns") that were sent to the Department. Mrs. Thomas testified as to the

procedure by which the sales tax returns would be prepared for filing with the Department. Mrs. Thomas testified that every month she received from another employee an adding machine tape showing the actual amount of sales taxes collected by Brown Specialty from sales to its customers. She also testified that she received handwritten notes from Mitchell Rudman, secretary-treasurer of the company, which contained the amount of sales tax to be reported to the Department. According to Mrs. Thomas, the figures supplied by Mr. Rudman for inclusion on the tax return to the Department were always substantially below the figures she received from her fellow employee which purportedly covered actual sales taxes collected. For the period 1969-1972, a period not at issue in the hearing from which review is sought, the tapes and notes with respect thereto were entered into evidence and showed that the figures reported, as per the instructions of Mr. Rudman, were only about 27% of the figures contained on the tapes stated to be supplied by the fellow employee.

For the periods covering 1962-1969, the period at issue in the hearings and at issue here on appeal, there were no similar notes or tapes produced. Mrs. Thomas testified that while she had kept such records, unknown to Mr. Rudman, they had been disposed of by her prior to the 1972 audit. Neither were the sales invoices covering 1962-1969 available for re-auditing by the Department. While there was no documentation concerning sales tax receipts and figures covering the period 1962-1969, Mrs. Thomas testified that sales tax reporting was done in the same manner during that period as during the 1969-1972 period about which she had already testified. She testified that Rudman would instruct her as to the figure to be reported as sales tax and that such figure was always substantially lower than the figure she received from a fellow employee which allegedly showed sales taxes collected. However, Mrs. Thomas admitted that her knowledge of the tax figures allegedly collected from customers was limited to the totals given to her by another employee. She testified that she had no first-hand knowledge of the basis for, or the accuracy of, the figures she received. She stated that she did not know what types of sales were involved and that she never looked at the invoices from which the figures were compiled. Neither, apparently, did she have any knowledge of the origin or basis for the figures supplied by Mr. Rudman. Mrs. Thomas had no specific knowledge of the amount of taxes which she claimed were underpaid for the period 1962-1969. Brought out on cross-examination for the purpose of impeachment was the fact that Mrs. Thomas had been unhappy with her position at Brown Specialty prior to her leaving in 1972. She left the employ of Brown Specialty on October 1, 1972, after giving only several minutes notice, and went to work for Galesburg Cigar Company, a competing business owned by Mr. Warren Blythe, on October 1, 1972. Two days after leaving

Brown Specialty and joining Mr. Blythe at Galesburg Cigar Company, Mrs. Thomas gave her information concerning tax returns to the Department of Revenue.

Also testifying on behalf of the Department at the hearings were Warren Blythe and Robert Morris, both of whom had been employees of Brown Specialty Company before going to work for Galesburg Cigar Company in 1972. Both men testified that on one occasion in 1968 or 1969, during an on-premises audit by the Department, they and several other employees removed a large number of sales invoices from the files of Brown Specialty at the direction of Mitchell Rudman. Both men testified that Rudman told them and others to remove from the files invoices which showed large amounts of sales taxes collected. Morris testified that he could not remember when he pulled the invoices nor what years were covered by them. He did not know whether the invoices removed were the subject of the audit. He did not know whether the invoices pulled were later furnished to the auditor. Morris also testified that after Blythe purchased Galesburg Cigar Company, Morris left Brown Specialty and went to work for Blythe. Warren Blythe testified that he did not know the period which the invoices covered. He also testified that he left Brown Specialty in August 1972, and purchased the competing Galesburg Cigar Company. Blythe testified that he called the Department concerning the tax irregularities of his former employer as a matter of conscience, shortly after purchasing Galesburg Cigar Company. He also made complaint to the Department of Justice concerning Brown Specialty, complaining of malicious pricing with intent to monopolize. It was on the basis of Blythe's initial complaint that the audit resulting in tax assessments was conducted by the Department. Morris and Blythe's testimony concerning the pulling of invoices was directly contradicted by two persons that they had testified helped them to pull invoices during the audit. Donald Adcock and Robert Cox, employees of Brown Specialty, testified that, contrary to the testimony of Blythe, they were not directed to pull invoices by Rudman and that they in fact did not pull invoices.

Also testifying at the hearing was Joseph Toal, a revenue auditor, who had conducted a 1969 audit of the Brown Specialty Company. During the audit, Toal examined sales invoices for a four-month period and on the basis of that period he determined a percentage formula for the balance of the months in the audit period, January 1966, through November 1968. During the course of his audit, no information was supplied to Toal from any employee concerning withholding of information or tampering with the records. Toal found, as a result of his audit, that an additional tax, in the amount of $760.51, was due for the period in question. Toal testified that he spent two weeks on the premises and that he had no reason to believe that any records were destroyed or

concealed. He stated that he found nothing unusual about the returns filed by Brown Specialty. Toal stated he was satisfied with the audit and felt it to be representative and fair.

Other testimony related to how the assessment figures for the periods 1962-1969 were arrived at by the Department. The amount of tax deficiencies for those periods was based upon the application of a percentage formula, taken from the period 1969-1972, to gross sales figures available for the 1962-1969 period. Exact figures concerning taxable sales for the 1962-1969 period were unavailable since the records had been disposed of by the company.

On the basis of the foregoing information presented at the hearings, the hearing officer determined that the returns filed for the periods 1962-1965 and 1965-1969 were fraudulent. In 1976, final assessments for those periods were issued. Brown Specialty then filed a complaint seeking judicial review of the administrative decision of the Department upholding the assessments. After reviewing the record made before the Department at the hearings, the circuit court reversed the decision of the Department, finding that the record did not support the determination of the Department that the returns filed by Brown Specialty were fraudulent. The court then held that since the returns were not proven to be fraudulent, the assessments were barred by the three-year statute of limitations. Ill. Rev. Stat. 1973, ch. 120, par. 443.

■ It is understood in administrative review in this State that the findings of the administrative agency on questions of fact are prima facie true and correct. (Ill. Rev. Stat. 1977, ch. 110, par. 274.) It is also established that it is normally not the province of the circuit court, on review, to weigh the evidence or to determine the credibility of witnesses. (*Peterson v. Board of Trustees* (1973), 54 Ill. 2d 260, 296 N.E.2d 721.) When there is sufficient evidence to support the findings of the administrative agency, its decision will be affirmed. The duty of the trial court, sitting in review over an administrative decision, is to determine whether that decision is contrary to the manifest weight of the evidence.

It is apparent from the trial court's written opinion in this case that the court was well aware of the above-stated rules concerning review of administrative decisions. The trial court, these rules in mind, reviewed all the evidence and determined that the record failed to show by clear and convincing proof that the alleged fraud had been committed. On this basis, it found that the decision of the agency was against the manifest weight of the evidence and it reversed the Department's assessments. While, therefore, there has been no Illinois case establishing the standard of proof required to show the filing of fraudulent returns under section 4 of the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1975, ch. 120, par. 443), the common law rule is that fraud must be proven by clear and

convincing evidence. (*Finney v. White* (1945), 389 Ill. 374, 59 N.E.2d 859.) Such a standard has also been utilized by the Federal courts in cases under the Internal Revenue Code wherein a civil fraud penalty is sought to be imposed. (*Bryan v. Commissioner of Internal Revenue* (5th Cir. 1954), 209 F.2d 822, 825; *Cirillo v. Commissioner of Internal Revenue* (3d Cir. 1963), 314 F.2d 478, 482.) We conclude that the "clear and convincing standard" is to be applied to actions, such as the instant one, wherein fraud is asserted under section 4 of the Retailers' Occupation Tax Act. ® 2, 3 As to the matter of judicial review of whether that standard was met in the proceedings before the agency, we note that any review of whether evidence was clear and convincing includes an examination of the quality of the evidence presented. Implicit in such an examination is scrutiny of the bias, interest and prejudice of the witnesses. Such an examination into these matters does not violate the rule that determinations of credibility are for the agency to make. In such a review, the court is not redetermining credibility, but rather considering factors affecting credibility in determining whether the agency met its burden of proof by clear and convincing evidence. When we review the record in the instant case, in light of the clear and convincing standard, we determine that the circuit court properly found that the Department did not meet its burden of showing fraud. The circuit court was correct in reversing the Department's decision on that basis.

The Department's case against Brown Specialty for the period 1962-1969, the only period at issue on this appeal, rests almost entirely upon the testimony of Josephine Thomas, Brown's bookkeeper for over 16 years before leaving to go to work for a competitor. Aside from considerations of her possible bias and prejudice against Brown, Mrs. Thomas' testimony suffers from a lack of factual basis and substantiation in the record. She admitted to having no knowledge of the accuracy of the monthly figures supplied to her by the other employee. Her testimony is that she had no knowledge or interest in the types of sales that were involved nor in the invoices from which the figures were gathered. The Department did not present any testimony establishing the general accuracy of those figures supplied to Mrs. Thomas. There was no documentary evidence produced by Mrs. Thomas to substantiate her claims for the 1962-1969 period, although such evidence was produced for the 1969-1972 period. Mrs. Thomas testified that she had kept journals covering the earlier years as well but that she destroyed them. Neither was the Department able to produce documentation in any form to substantiate the allegations of fraud for the period in question. The Department seems to suggest that Brown Specialty destroyed records for those years so as to insulate itself from further auditing, but the record does not support such suggestion.

The basic requirement is that the books and records with regard to

sales of personal property be kept for a minimum of three years. (Ill. Rev. Stat. 1973, ch. 120, pars. 443, 446.) While it would appear that by the terms of the statute, the three-year limit is not applicable to cases involving the filing of fraudulent returns, the Department's position as to the effect of failing to keep records beyond three years is untenable. The Department's position would appear to be that taxpayers may destroy their records after three years unless they have filed fraudulent returns, in which case they must keep the records and books substantiating such fraud. If they fail to do so, then the implication of having destroyed the records can be used, in a subsequent fraud action, as some evidence of the fraud. While we can sympathize with the Department's procedural concerns as to proof of fraud without such records and books, the result asserted by the Department is not grounded in fact or law, on the record. In the present case, there was the 1968 audit of Brown Specialty by the Department which turned up nothing unusual in the manner in which the sales tax returns were filed nor in the amounts reported. At no time after that audit was Brown Specialty informed or ordered not to dispose of records and books once the three years had passed. It would be unfair to find that since the Department later claimed Brown filed fraudulent returns for 1962-1969 that an unfavorable inference is to be drawn from the fact of disposing of the records. In the instant case there is nothing to support a finding that the destruction of the records covering 1962-1969 was done for the purpose of destroying evidence of fraud. The Department apparently did not attempt to substantiate the fraud claims using outside information from customers or suppliers of the company. It was its position that such documentation would have been impossible. In fact, the only documentation provided at the hearing on the period 1962-1969 was that in auditor Toal's 1968 audit report, a report which showed only minor discrepancies between taxes collected and those reported. The circuit court found it difficult to believe that such would have been the case had the receipts been pulled from the files during the audit in the manner testified to by Blythe and Morris. The figures from Toal's worksheet show only a minimal difference between deductions on the original returns and deductions per the audit.

Blythe and Morris testified that during the audit they and other employees were instructed to pull invoices with large sales tax figures, the implication being of course that such invoices were withheld from the auditor. However, their testimony is subject to serious question. The principal fact tending to contradict their testimony is Toal's own audit. If the extensive random pulling of invoices occurred as they testified, it is difficult to believe that the two-week audit would not have produced irregularities far in excess of those minor ones found. In addition, there is

the fact that their testimony was directly contradicted by two Brown employees who allegedly helped them pull invoices. A further fact tending to discredit their testimony is that Blythe was the person instigating the charges of fraud against Brown, a scant several months after purchasing a competing business and after having hired Brown's former bookkeeper. Morris, too, was a recently hired employee of Blythe when he gave his testimony to the Department initially. So was Josephine Thomas. No information as to the allegedly fraudulent practices of Brown Specialty was produced until shortly after Blythe had begun competing with Brown Specialty and had hired Morris and Thomas to work with him at Galesburg Cigar Company. We do not mean to imply that we find the testimony of these persons to be untrue, for that would be beyond the proper scope of our review. However, the facts as to bias, prejudice and interest are significant in terms of judging whether the clear and convincing standard was met by the Department's presentation.

When the Department's case against Brown for the period 1962-1969 is considered as a whole, including the facts as to bias and interest of the witnesses, the unsubstantiated and speculative nature of Thomas' testimony, the lack of documentation for the period in question and the 1968 audit report showing no significant irregularities, the circuit court was justified in finding that the Department did not prove, by clear and convincing evidence, that Brown Specialty filed fraudulent returns for the period 1962-1969. Since fraud was not proven of record, the assessments for the periods were barred by the three-year statute of limitations.

Accordingly, the decision of the Circuit Court of Knox County is affirmed.

Affirmed.

STOUDER, P. J., and STENGEL, J., concur.